## JAMES ENRIGHT v. THE SAN FRANCISCO AND SAN JOSE RAILROAD COMPANY.

INSTRUCTIONS TO THE JURY.—If the plaintiff is not entitled to recover upon his own showing, the appellate Court, on his appeal, will not pass on the correctness of the instructions given by the Court to the jury.

FENCE ON LINE OF RAILROAD.—The Act of 1861, requiring railroad companies to maintain a sufficient fence on both sides of their property, without prescribing what a sufficient fence shall be, must be considered as referring to and adopting the general law fixing the standard of lawful fences.

INJURIES TO CATTLE BY RAILROAD.—If an insufficient barway is placed, by a railroad company, in a fence on the line of its road, at the request of and for the use of the owner of adjoining land, and he uses the same, and does not complain of its insufficiency, or notify the company to alter it, the company is not liable for damages for injuries to his cattle happening in consequence of the barway being too low to turn cattle.

FENCE ON LINE OF RAILROAD.—The provisions of the law requiring railroad companies to build fences on the lines of their roads, are designed for the protection of adjoining owners, and such provisions may be waived by them.

EVIDENCE OF EXPERTS.—The opinion of experts is not admissible on the question of the sufficiency of a fence to turn cattle.

EVIDENCE IN FENCE CASE.—If the plaintiff introduces evidence to show that he contracted with a railroad company as to the kind of fence to be built, he is precluded from introducing evidence as to the statutory character of the fence.

APPEAL from the District Court, Third Judicial District, Santa Clara County.

The facts are stated in the opinion of the Court.

*Moore & Laine*, for Appellant, argued:

That the verdict was against the evidence, because a statutory fence had not been kept up by defendant, and that the Court erred in not allowing the testimony of experts; and on

the last point cited 4 Barb. 625 ; 11 Cushing, 257 ; and 1 Smith's Leading Cases, 630.

They also argued that the words "good and sufficient fence," in the Railroad Act of 1861, did not refer to and were not governed by the fence law of 1855. That the latter was merely intended to protect crops, while the former referred to a dangerous business—that of railroading; and that a "good and sufficient fence" to protect a crop would not be such fence if built by the side of a railroad.

*C. T. Ryland,* for Respondent.

The general rule is, that the opinions of witnesses are not evidence. (1 Green. Ev., Sec. 440 ; *Morehouse* v. *Mathews,* 2 Coms. 514 ; *Harger* v. *Edmond,* 4 Barb. 256.) If the plaintiff seeks to overthrow this general rule he must bring himself clearly within the exceptions. (Best Prin. Ev., par. 344.) The opinion of the witness was sought upon one of the most common and ordinary subjects, and not upon a question of skill or science. The opinions of the witness upon such questions might be as various and as fickle as the mind of man. There is nothing to guide the opinions of witnesses but fancy, and the diversity would be endless. The following cases, in addition to the authorities already cited, will be found to bear on the question : *Paige* v. *Hazard et al.,* 5 Hill, 603 ; *Dunham* v. *Simmons,* 3 Hill, 609 ; *Newman* v. *Wells,* 17 Wend. 136 ; 13 Wend. 81 ; 24 Wend. 668 ; *Folks* v. *Chadd,* 3 Doug. 157, is a leading case ; 9 Bing. 335. The law is ably and clearly reviewed in 17 Wend. 161, and the true rule stated. We would ask its examination. Exceptions to the general rule should not be rashly multiplied.

While respondent admits that, under section forty of the Railroad Act, it was the duty of the company to make and maintain good and sufficient fences, we contend that that duty may be waived, and if it is waived, the party waiving cannot complain.

Section forty itself provides for a waiver, and shows that

the responsibility may be shifted. On this question I would simply ask: Why is it that there can be no waiver? Why is it that the party who complains may not have the power to waive his right? Why may not he by his act shift the responsibility from the shoulders of the railroad company to his own, as he could do in other cases?

Pierce, in his work on American Railways, (p. 344,) under the head of "Waivers," says: "That the provisions of a statute requiring the company to maintain fences on the sides of its tracks, which is to be interpreted as designed for the protection of the adjoining owner, may be waived by him, or the duty assumed by himself." He further says, that the effect of such waiver is to *exonerate* the "company from liability for injuries to his cattle in consequence of the fence not being constructed according to the requirement of the statute." It would appear from this author, whose work has been cited and approved by this Court, that the provisions of the statute may be waived, and that such waiver not only shifts the responsibility, but exonerates the company from liability to such land owner when his stock is injured. To the same effect is the doctrine laid down by Redfield on Railroads, p. 373. It is decided in 8 Foster, 161, that the responsibility may be shifted. The same doctrines may be found in 25 Vt. 116, 150; 27 Vt. 49; 18 Barb., N. Y., 583.

*Moore & Laine*, in Reply, argued that as the Railroad Act provided that " In any case where the railroad company have heretofore or may hereafter pay to the owner or owners of the land through which or alongside of which their road is or may be located, an agreed price for making and maintaining such fence, or whenever the cost of such fence has been or may be included in the award of damages allowed and paid for the right of way for such railroad, such company shall be entirely relieved and exonerated from all claims or awards of damages arising out of the killing or maiming any animals as aforesaid in favor of all persons or their successors or assigns who shall thus fail to construct and maintain such

fence." That a railroad company could not avoid the respon-
sibility of building a fence in any other than the statutory
mode.

By the Court, SHAFTER, J.:

This is an action to recover the value of seven horses run
over and killed by the defendant's cars. The complaint is
in two counts. The first charges that the horses were pas-
turing on lands lying alongside of and adjoining the defend-
ant's road, and that they escaped from the premises on to the
road by means of the insufficiency of a fence which the
defendant was bound to build and maintain. The second
count charges generally that the horses escaped from the
pasture to the road by reason of the defendant's negligence,
and without any fault on the part of the plaintiff; and that
the horses were run over and killed by a locomotive and
cars, under the conduct of the defendant's servants and
agents.

All the allegations of the complaint were denied. Verdict
and judgment for defendant. The appeal is from the judg-
ment and order denying plaintiff's motion for a new trial.

The questions presented relate to the sufficiency of the
evidence to justify the verdict; to the ruling of the Court as
to the admissibility of evidence offered at the trial, and to
the instructions given to the jury.

First—We do not consider it necessary to pass upon the
correctness of the instructions, for, in our judgment, the
plaintiff was not entitled to recover on his own showing. He
made no case calling for any other instruction than a direc-
tion to the jury to return a verdict for the defendant.

The evidence of the plaintiff tended to prove that the
general line of the fence between the field from which the
horses escaped and the railroad, was not only a "lawful
fence," as defined by the Act of April 27th, 1855 (Acts 1855,

p. 154), but that in the matter of the depth of the post holes and the size of the posts, the fence was a better one than the statute required. The fortieth section of the Act of 1861 concerning railroad companies (Acts 1861, p. 607), requires such companies " to make and maintain a good and sufficient fence on both sides of their property." The Act does not itself prescribe any standard or test of sufficiency, but it must be considered as referring to and adopting the standard previously established by the Act of 1855.

It further appeared from the plaintiff's evidence that the horses escaped from the pasture through a pair of bars in the line of the fence and forming a part of it; that the barway was fourteen or fifteen feet wide; that the top bar was three feet ten inches, the second two feet eight inches, and the third eighteen inches from the ground, and that each of the three bars was one inch thick and six inches in width; that a cleat was nailed to either bar post and that the bars were slipped in between the cleats and the posts, and that the ends of the bars passed into and through these fastenings from six to eight inches; that the bars were of fir, and were made like other bars; that they had no other fastenings than those already named, and that they could be thrown down by horses or other animals rubbing against them.

There is nothing in the Railroad Act of 1861 relating especially to the construction of barways in the line of railroad fences; but considering the bars in question as a section of the fence, they did not come up to the statute standard. By that the bar posts should not have been more than eight feet apart, and the topmost bar should have been at least four and a half feet from the ground. But the plaintiff, who was examined on his own behalf, testified that the land upon which the horses were pasturing belonged to S. Doane at the time the road was surveyed, and to one Kifer at the time the fence was built; that Kifer sold to the plaintiff; that the bars were built for the convenience of Kifer, and the defendant had no use for nor benefit from them. The facts were known to the plaintiff, and he used the barway after he came

to the title and possession of the land, in the same manner that Kifer had done before him. Kifer was called by the plaintiff and testified as follows : " I was the owner of the land when the track was laid ; I bought of Doane, and sold to the plaintiff. The bars in question were put there by the defendants for my convenience and at my request; and were so used by me and afterward by the plaintiff. The bars are wider than are generally used, but they were left wide at my request, so that I could get my reaping machinery through. I never made any complaint to the company about them ; I was satisfied with them and watched them close to keep them up. Persons went through them and did not put them up. When the plaintiff went into possession he used the bars in the same way. Plaintiff lived there and still lives within sight of the bars, and about three hundred or four hundred yards distant therefrom." There was no evidence that either the plaintiff or Kifer ever expressed any dissatisfaction with the bars, or even requested the defendant to improve or alter them in any particular; while the evidence of the defendant was to the effect that no such request was ever made.

Assuming the facts which the evidence tended to prove, they amounted to a waiver, by Kifer in the first and by the plaintiff in the second instance, of the " lawful fence " of the statute, so far as the barway was concerned. The substitution of the one for the other was not by the election of the defendant, but by the choice, and virtually by the act of Kifer; and the plaintiff, as his successor in interest, subsequently sanctioned the substitution by his conduct. If the plaintiff considered that the barway was in any respect unsuitable for " his use and convenience," he ought, on the plainest principles of good faith, to have given the defendant notice. The defendant was excused from further action by the silence and inaction of the plaintiff. Nor on the evidence could it have been in the understanding of parties that the defendant should be responsible for the bars being put up whenever taken down by the plaintiff or by strangers, or

when displaced by the plaintiff's horses or cattle. As that kind of service became necessary only in consequence of the defendant's compliance with Kifer's request and the plaintiff's subsequent indorsement of it, the burden of keeping the bars in position must have been, in the understanding of parties, with the plaintiff—a conclusion, the correctness of which is fully borne out by their conduct. As it appeared from all the evidence that the plaintiff was alone responsible for the loss of which he complained, it follows that the instructions, howsoever erroneous in the abstract, could have been of no prejudice to the plaintiff.

Our views on the subject of the defendant's responsibilities are fully sustained by the authorities. The rule, deducible from them is, that the provisions of a statute requiring a railroad company to maintain fences on the sides of its track, is a provision designed for the protection of adjoining owners; and that the provision may be waived by them ; and that the effect of a waiver will be to exonerate the company from liability for injuries to cattle happening in consequence of the fence not being constructed according to the requirements of the statute. (Pierce on Railways, 344 ; Redfield on Railways, 373 ; *Hurd* v. *The R. and B. R. R. Co.*, 25 Vt. 116 ; *Tombs* v. *R. and S. R. R. Co.*, 18 Barb. 583.)

Second—The evidence of experts offered by the plaintiff on the question of the sufficiency of the bars and barway, was properly excluded. By the introduction of evidence tending to prove that a fence, sufficient in the statute sense, or sufficient to turn stock, was superseded by a conventional barway and bars, the plaintiff was precluded from testing the responsibility of the defendant by a standard thus jointly discarded. The only question was as to whether the defendant in fact provided the substitute agreed upon. Aside from this, however, we are satisfied that the point was not one upon which the opinion of experts was admissible. The facts of the fence, bars and barway included, were to be testified to by the witness; but the question of sufficiency, assuming it to have been in the case, was with the jury, and

not with them. The point was not one of science nor of peculiar or educated skill. The habits and instincts of domestic animals, and the kind of fence necessary to restrain them, are so far matters of general observation and experience that a jury coming from the body of a county may be relied on to deal with questions like the one in hand with all desirable accuracy, though unaided by the opinion of persons claimed to be experts. (*Norman* v. *Wells*, 17 Wend. 161.)

Judgment affirmed.